# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT
## OF MICHIGAN

THE SAGINAW CHIPPEWA INDIAN
TRIBE OF MICHIGAN, a federally
recognized Indian tribe,

Court File No.   11-cv-14652

Plaintiff,

vs.

THE NATIONAL LABOR RELATIONS
BOARD, and in their official capacities as
members of the board, MARK G. PEARCE,
Chairman, CRAIG BECKER, and BRIAN
HAYES.

Defendants.

# COMPLAINT FOR
# IMMEDIATE INJUNCTIVE AND DECLARATORY RELIEF

Plaintiff, that Saginaw Indian Tribe of Michigan, by and through its counsel, hereby

alleges as follows:

## I.   NATURE OF THE ACTION

This action is brought to protect the Saginaw Chippewa Indian Tribe's (the "Saginaw

Tribe's") sovereignty from immediate and irreparable infringement by the National Labor

Relations Board ("NLRB" or "Board") and its members (collectively, the "Board") in violation

of court rulings that general federal laws do not apply to a tribal government's exercise of

sovereign authority absent express congressional authorization. *Dobbs v. Anthem Blue Cross

and Blue Shield*, 600 F.3rd 1275, 1283 (10th Cir. 2010).  At a hearing scheduled to commence on

November 2, 2011 the Board will seek to apply the National Labor Relations Act ("NLRA"),

29 U.S.C., 29 U.S.C., §§ 151–169, to the Saginaw Tribe's regulation, operation and management of gaming pursuant to the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701- 2721. The Board's actions are aimed at one of the Tribe's duly chartered and licensed gaming locations, the Soaring Eagle Casino and Resort ("SECR"). The Board will try to subject the Saginaw Tribe to trial on unfair labor practice charges under Section 8 of the NLRA, 29 U.S.C. § 158. The Board is proceeding on behalf of the International Union, United Automobile, Aerospace and Agricultural Implement Worker of America ("UAW" or "Union"), which has not been authorized by the Saginaw Tribe to enter or engage in activities within the Saginaw Tribe's Isabella Reservation or the SECR. SECR is a gaming facility duly chartered and operated pursuant to tribal law and IGRA and a federally approved Compact with the State of Michigan.

The Saginaw Tribe operates gaming activities at the SECR location as part of its government gaming, conducted as an exercise of the Saginaw Tribe's treaty right of self government and inherent sovereign authority to engage in economic activity pursuant to IGRA and the regulations issued thereunder. Indian tribes are authorized to conduct tribal government gaming under IGRA as a "means of promoting economic development, and strong tribal governments," 25 U.S.C. § 2702(1), and may use gaming revenues only for governmental and charitable purposes. *Id.* at § 2710 (b)(2)(B). IGRA further provides that Indian tribes may conduct Class III ("casino") gaming only in accordance with a tribal ordinance approved by the Chairperson of the National Indian Gaming Commission, *id.* at § 2710 (d)(1)(A), and pursuant to a Tribal-State Compact, *id.* at § 2710 (d)(1)(C), which the Secretary of the Interior has approved. *Id.* at § 2710 (d)(8). The Saginaw Tribe has met both of the above requirements. *See* Saginaw Tribe and State of Michigan's Gaming Compact ("Compact"), 58 Fed. Reg. 63262 (Nov. 30, 1993). This documentation manifests that the Saginaw Tribe's regulation, operation

2

and management of gaming at the SECR is an exercise of the Saginaw Tribe's sovereign authority.

The Saginaw Tribe has had a long history of protecting and exercising its sovereign authority over its lands, its reservations and its members through treaties, traditions, and tribal laws. Federal Courts have recognized that State and local laws and regulations do not apply to the tribe and its members on its reservation without the tribe's consent; moreover, "federal regulatory schemes do not apply to tribal governments exercising their sovereign authority absent expressed congressional authorization." *Dobbs*, 600 F. 3rd at 1283 (footnote omitted) (emphasis added).

Congress has not expressly authorized the application of the NLRA to Indian Tribes. Nothing in either the text or the legislative history of the Act even mentions Indian Tribes. *See NLRB v. Pueblo of San Juan*, 276 F. 3rd 1186, 1196 (10th Cir. 2002) (noting that "neither the legislative history of the NLRA, nor its language, make any mention of Indian Tribes" and holding that the NLRA did not divest the Pueblo of San Juan of its inherent sovereign authority to enact a right to work ordinance).

In a direct affront to the Saginaw Tribe's sovereignty, the Board has scheduled a hearing to commence November 2, 2011, during which the Board intends to apply the NLRA to the Saginaw Tribe by requiring the Saginaw Tribe to answer unfair labor practice charges. The Board's actions will put the existence of the Saginaw Tribe's sovereign rights to be governed by its own laws and conduct its own economic enterprises and governmental gaming at the SECR on trial. The Board's actions, if not enjoined, will impair and threaten to abrogate the Saginaw Tribe's treaty right of self government, the very essence of its sovereignty, and the treaty right to exclude undesirable intruders from its lands. The Board's actions would also threaten and impair

3

the Saginaw Tribe's sovereign authority to engage in and regulate economic activity and to fund essential government functions. Further, the Board's actions violate the Saginaw Tribe's rights under IGRA. At its heart, the Board's action threaten to divest the Saginaw Tribe of its lawmaking powers and regulatory authority by allowing a non tribal entity to use the "collective bargaining" process to determine what laws and whose policies and regulations will apply to the Saginaw Tribe's gaming facility. The Board's actions would further impose the threat of a labor strike on a facility wholly owned and operated by the Saginaw Tribe. Under settled law, these impacts on the Saginaw Tribe's sovereignty constitute irreparable harm. *See Prairie Band of Potawatomi Indians v. Peirce*, 253 F 3rd. 1234, 1250-51 (10th Cir. 2001) (prospect of significant interference with tribal self-government constitute irreparable harm).

### A.    CURRENT NLRB COMPLAINT BACKGROUND

On April 1, 2011, a charge was filed by former SECR employee, Susan Lewis, with the NLRB alleging violations by SECR of the NLRA. Susan Lewis was suspended and ultimately terminated from her employment with the SECR under the Tribe's progressive disciplinary policy for repeated violation of the Tribe's No Solicitation Policy. The Tribe agreed to cooperate with the NLRB's investigation of the charge while preserving its right to challenge the jurisdiction of the NLRB over the SECR. The NLRB investigated the charge and on September 13, 2011 filed a Complaint against the SECR alleging that the Tribe's No Solicitation Policy violates the NLRA. The Tribe filed an Answer by Special Appearance with the NLRB on September 22, 2011 contesting the jurisdiction of the NLRB over the Tribe or its enterprises. On September 27, 2011 the Tribe received correspondence from the NLRB relaying their position that the Tribe's answer was incomplete under NRLB rules and threatening a motion to strike the Tribe's answer and to deem certain allegations as admitted if an amended Complaint was not

filed with the NLRB.   The Tribe filed an amended answer with the NLRB on October 3, 2011 in an effort to avoid procedural complications that would be inherent in a ruling that ignored the Tribe's jurisdictional arguments. The NLRB has scheduled this matter for trial by a NLRB administrative law judge for November 2, 2011.

### B.   PRIOR NLRB CASES

The NLRB charges described above are the latest in a series of actions over the last several years by unions to seek access to SECR and attempt to have the NLRB assert its jurisdiction and apply the NLRA to the Tribe.

#### 1.   Teamsters election case

On October 12, 2007, a petition for election was filed by the NLRB for employees of the SECR Casino Housekeeping Department.  The Tribe asserted its position that the NLRA does not apply to Indian tribes and that the NLRB did not have jurisdiction in that case.  The Tribe participated in a hearing in that matter on October 30, 2007 and presented evidence that substantiated the Tribe's position that the NLRB lacked jurisdiction over the Tribe or the SECR. The Regional Director reviewed the record established at the NLRB hearing and ruled that the NLRA applied to the SECR.   The Tribe filed an appeal from the decision of the Regional Director to the NLRB on December 3, 2007. The Tribe's appeal was summarily rejected by the NLRB in its Order of December 19, 2007 because in the view of the Board the Tribe's request for review raised "no substantial issues warranting review."   The NLRB's treatment of the complicated legal issues associated with the proper cannons of Indian law and the Tribe's treaties with the United States illustrate the inability of the NLRB process to adequately address the substantive legal issues involved in this case.

### 2. Security Union election case

On November 28, 2007 the Security Union filed a Petition to Hold Representative Election. On December 11, 2007, the Tribe was notified that the Petition was withdrawn. On December 10, 2007 the Security union filed a second Petition to Hold Representative Election. A hearing on the petition was held on December 21, 2007 and the Tribe filed its Motion to Dismiss on January 2, 2008. The Regional Director issued his Decision and Direction for Election on January 17, 2008. The Tribe filed a Request for Review of Regional Director's Decision and To Stay Election on January 29, 2008 and on February 15, 2008 the Tribe received notice that the Regional Director had administratively cancelled the election and approved the withdrawal of the petition.

### 3. Teamsters' challenge

On December 14, 2007, the Teamsters filed a charge with the NLRB alleging that the SECR was denying employees their rights under the NLRA by establishing Ordinance 28-Tribal Government Labor Ordinance. The NLRB investigated the Charge and on January 23, 2008 the NLRB notified the Tribe that a Complaint would be issued unless the parties could reach a settlement. The Complaint was issued on January 28, 2008 and the Tribe filed its Answer on February 8, 2008. An Amended Complaint was filed on July 28, 2008 and the Tribe filed its Answer by Special Appearance on August 12, 2008. Settlement negotiations continued until September 10, 2008 when a final settlement was approved by Tribal Council Motion. The Settlement required the Tribe to repeal Ordinance 28 and to provide adequate notice of the repeal to the employees who would be impacted. The NLRB issued an Order Conditionally Approving Withdrawal Request, Dismissing Complaint, and Withdrawing Notice of Hearing on September 15, 2011. The Tribal Council approved Resolution 08-148 to repeal Ordinance 28 on September 17, 2011 and notified employees by placing a printed notice in the paycheck envelopes.

In each of these prior proceedings, the Saginaw Tribe preserved its jurisdictional arguments and sought to raise its treaty rights and rights of self-government inherent in establishment of its Reservation as a permanent homeland. The NLRB has not been willing to give consideration to the Tribe's sovereign rights established and protected by treaty with the United States. The Saginaw Tribe therefore brings this action for immediate injunctive and declaratory relief.

## II.    THE PARTIES

1.    The Saginaw Tribe is a federally recognized Indian Tribe. *See* 75 Fed. Reg. 60,810 (Oct. 1, 2010). The Saginaw Tribe operates SECR as part of its sovereign authority to make its own laws and, as described in its gaming charter, considers it an essential governmental function. The Saginaw Tribe's Charter for Soaring Eagle Gaming ("SEG") describes the Tribe's Authority for forming SEG. (Attached as Exhibit 3 to Memorandum in Support of Tribe's Motion for a Temporary Restraining Order and Preliminary Injunction, filed concurrently, hereafter "Tribe's Memorandum"). Section 1 of the Charter provides:

> The Saginaw Chippewa Indian Tribe of Michigan, (hereafter "Tribe"), is a federally recognized Indian tribe. The elected Saginaw Chippewa Tribal Council, acting pursuant to its inherent sovereign governmental authority, and pursuant to the power of the Tribal Council enumerated in Article IV, Sections 3, 4, 6, 7, 9 and 10 of the Constitution and By-Laws of the Tribe, hereby charters Soaring Eagle Gaming (hereafter "SEG"), an entity created, wholly owned and controlled by the Tribe.

2.    The Saginaw Tribe's Charter for SEG describes SEG's relation to the Tribe. The Charter provides in the Section 4.2:

> Relationship to Tribe.    SEG is a tribal public body and a subordinate, wholly-owned governmental subdivision of the Tribe and has been delegated the right to exercise one or more of the substantial governmental functions of the tribal government. It is the purpose and intent of the Tribal Council, in enacting this

> Charter, that the operations of SEG be conducted on behalf of the
> Tribe for the sole benefit and interests of the Tribe and its
> members. In carrying out its purposes under this Charter, SEG
> shall function as an economic arm of the Tribe.

Section 4.3 further provides:

> Tribal Council Action. All agreements, approvals, consents,
> authorizations, appointments or other similar actions to be taken,
> given or made by the Tribe under this Charter shall be manifested
> by or based on an authorizing resolution of the Tribal Council.

3. The Saginaw Tribe's Charter for SEG describes in detail the Tribe's purposes for

establishing gaming pursuant to IGRA. The Charter provides in the Section 3.1:

> Purposes. SEG shall conduct its affairs to achieve the following
> purposes
>
> (a) To conduct, operate and manage all Class II and
> Class III gaming exclusively on behalf of the Tribe on "Indian
> lands," as that term is defined under the Indian Gaming Regulatory
> Act, 25 U.S.C. § 2703(4), as amended, and all gaming allowed
> under a Class III gaming compact to which the Tribe is a party, and
> to conduct, operate and manage on behalf of the Tribe all related
> and support activities, including, but not limited to, food service,
> alcoholic beverages, retail cigarette sales, hotel management, travel
> and tourism, hospitality services and parking, and to provide policy,
> oversight, management, ownership and control over all such
> gaming and gaming-related and support activities in conformance
> with Applicable Law and the terms of a Class III gaming compact
> to which the Tribe is a party, all for the betterment of the Tribe and
> its members;
>
> (b) To engage in such activities, functions and
> operations as provided for under this Charter on a contract basis or
> through the formation of a partnership, corporation, joint venture or
> other form of business with other persons or entities, provided that
> SEG shall not enter into any gaming management contract or
> agreement without the express written approval of the Saginaw
> Chippewa Tribal Council;
>
> (c) To further Indian industry and labor, and economic
> development within the Tribe's jurisdiction as provided for in the
> Act of June 25, 1910, 36 Stat. 861 (25 U.S.C. §47), Section1 of the

8

Act of May 9, 1938, 52 Stat. 302 (25 U.S.C. §306), and all other federal laws supporting economic development in Indian country;

(d)     To train members of the Tribe and others entitled to preference under Applicable Law and SEG Personnel Policies for skilled employment and for promotion to supervisory and managerial positions;

(e)     To promote and provide employment in all categories of employment to members of the Tribe and others entitled to preference under SEG Personnel Policies and Applicable Law;

(f)     To provide economic benefit to and foster self-determination and economic self-sufficiency of the Tribe and its members through enterprise returns and related employment and business opportunities;

(g)     To remedy the disproportionate unemployment and under-employment of tribal members residing both on and off the Reservation;

(h)     To provide revenue to the Tribe with which the Tribe can address pressing matters of public health, safety and welfare, or for other tribal purposes; and for the purpose of providing revenue to the Tribe in furtherance of the policies of Congress expressed in the Act of January 4, 1975, 88 Stat. 2206 (25 U.S.C. §§450, *et seq.*) and particularly in Section 102 of Title I of that Act (25 U.S.C. §450f) (Indian Self-Determination), as amended, and the Act of November 2, 1921, 42 Stat. 208 (25 U.S.C. §13) (Snyder Act) in the exercise of each and every essential governmental function reasonably necessary or proper to further such purposes and policies; and

(i)     To do any and all activities which may be necessary, useful or desirable for the furtherance, accomplishment, fostering or attainment of the foregoing Purposes, either directly or indirectly, either alone or in conjunction or cooperation with others, whether such others be persons or organizations of any kind or nature, such as corporations, firms, associations, trusts, institutions, foundations, or any governmental bureaus, departments or agencies.

4.  The Tribe's Charter also addresses the Saginaw Tribe's policies of economic self-sufficiency and self-determination. The Charter provides in Section 3.5:

> Tribal Policy of Economic Self-Sufficiency and Self-Determination. The Tribe is vigorously pursuing its goal of self-sufficiency and self-determination through the development of tribal businesses and enterprise. Because the Isabella Indian Reservation lacks sufficient income-generating natural resources and because the Tribe's tax base is nearly non-existence, the Tribe must rely on tribal business development to raise the funds necessary to finance and expand its social, health, education and governmental services programs, increase employment within the Reservation and improve the Tribe's on-Reservation economy. This effort has recently become increasingly important as a result of cut-backs in federal and state funding and increased costs of self-government. It is therefore essential that the Tribe develop new and expanded sources of revenue to support its ever-increasing governmental needs and to provide much needed employment and training opportunities for tribal members.

5.  The Tribe's Charter reflects a strong commitment to tribal self-government. Section 3.6 provides:

> Tribal Policy of Self-Government. The Tribe is firmly committed to the principle of tribal self-government. Consistent with federal policy, tribal government provides a wide range of public services on the Reservation, including general governmental services, maintenance of peace and good order, establishment of educational, health care assistance and programs, and the promotion and regulation of economic activities within the sovereign jurisdiction of the Tribe.

6.  The Charter sets forth the Saginaw Tribe's gaming policy. Section 3.7 provides:

> Tribal Gaming Policy. The establishment, promotion and operation of tribal gaming on the Isabella Indian Reservation is necessary and desirable, provided that such gaming is regulated and controlled by the Tribe pursuant to tribal and federal law and in conformance with any tribal-state gaming compact entered into pursuant to the Indian Gaming Regulatory Act, and provided that all proceeds of such gaming are used for the benefit of the Tribe as required by the Indian Gaming Regulatory Act and tribal law. When operated in accordance with applicable provisions of tribal

10

and federal law, such gaming will be conducive to the general welfare of all members of the Tribe.

7.    The Charter establishes that operation of gaming at SECR is an essential government function. Section 3.8 provides:

> Essential Governmental Function.  The creation and operation of SEG serves an essential governmental function of the Tribe by providing a tribally owned, operated and controlled gaming enterprise for the operation, management and control of gaming on the Reservation and related activities and by increasing revenues and employment for the Tribe and within the tribal and Reservation community.    Tribal profits resulting from SEG activities shall help alleviate the fiscal effect resulting from the lack of an inadequate tribal tax base and provide a funding source for the exercise of tribal sovereignty and the operation of tribal governmental programs and services.

> The creation and operation of SEG also serves an essential governmental function of the Tribe by addressing the serious economic, social and health problems associated with unemployment and under-employment within the jurisdiction of the Tribe, the general lack of tribal funds to address these problems, the general lack of a sufficient land base for the economic development needs of the Tribe and the attendant effects on the public health, safety and welfare of the Tribe and its members.

> The creation of SEG addresses a situation which is not, and cannot be, wholly relieved through the operation of private tor enterprises alone, and that shall providing provide job training and relief from critical unemployment and under-employment, developing tribal revenue-generating public and private sectors, and developing tribal resources for financing and promoting economic development on the Isabella Indian Reservation are public uses and purposes that are essential governmental functions of the Tribe, for which public moneys can be spent and private property acquired, and are governmental functions of tribal concern.

8.    Pursuant to the Saginaw Tribe's Constitution, it has sovereign authority over lands set aside for its Reservation. The lands occupied by the Saginaw Tribe within the State of Michigan were first set apart by Executive Order in 1855 and then secured by Treaties in 1855

and 1864. The 1864 Treaty specifically stated the land selected in Isabella County set aside as the Isabella Reservation would be set aside for the "exclusive use, ownership, and occupancy of the Saginaw Chippewa."[1]

9. The National Labor Relations Board is a federal agency that administers the Federal Labor Relations Act, 29 U.S.C. § 159-169, and maintains offices nationwide, including an office in Detroit, Michigan.

10. Defendant Mark G. Pearce is Chairman of the National Labor Relations Board and is sued in his official capacity.

11. Defendant Craig Becker is a member of the National Labor Relations Board and is sued in his official capacity.

12. Defendant Brian Hayes is a member of the National Labor Relations Board and is sued in his official capacity.

13. National Labor Relations Board and the individual defendants sued in their official capacity described in paragraph 10 through 12 are collectively referred to as the "Board Members."

## III.   JURISDICTION AND VENUE

14. This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 1362 because it is brought by a federally recognized Indian tribe with a governing body duly recognized by the Secretary of Interior and raises substantial questions of federal law

---

[1] Executive Order of May 14, 1855, Kappler, Charles, Comp. and Ed., "Indian Affairs: Laws and Treaties" (Washington: Government Printing Office, 1913), Vol. III, 846-47; Treaty with the Chippewa of Saginaw, Swan Creek, and Black River, August 2, 1855, 11 Stat. 683 (Aug. 2, 1855); and Treaty with the Chippewa of Saginaw and Swan Creek and Black River, 1864, 14 Stat. 637 (Oct. 18, 1864).

arising under the United States Constitution, treaties between the United States and Saginaw Tribe, and federal statutory and common law.

   a.  Article 6 of the United States Constitution, the Supremacy Clause, provides that Treaties are the "Supreme Law of the Land."

   b.  The federal statutory law pursuant to which this Court has jurisdiction is IGRA, 25 U.S.C. § 2701-2721. *See also Pueblo of Santa Anna v. Kelly,* 104 F. 3rd, 1546, 1557 (10th Cir. 1997) (federal jurisdiction to interpret IGRA and resolve compacts-dispute); *Gaming Corp. of Am. v. Dorsey & Whitney* 88 F. 3rd, 536, 548-50 (8th Cir. 1986) (federal jurisdiction over claims alleging interference over licensing process under IGRA); *Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians Florida*, 63F. 3rd 1030, 1046-47 (11th Cir. 1995) (federal jurisdiction over claims based on IGRA and IGRA regulations).

   c.  The federal common law pursuant to which this Court has jurisdiction is articulated in *National Farmers Union Insurance Co. v. Co Tribe,* 471 U.S.C. 845, 850-53 (1985), which holds that the scope of Tribal Sovereign authority presents a federal question under 28 U.S.C. § 1331.

 15.  Venue is proper in the Eastern District of Michigan under 28 U.S.C. § 1391(b) because this District includes the Tribe's Isabella Reservation, the territory over which the tribe exercises sovereign authority and operates and manages and regulates federally licensed approved gaming facilities within this district, and because the NLRB proceedings which this action seeks to enjoin are scheduled to commence on November 2, 2011 at Mt. Pleasant, Michigan, which is also located within this District.

## IV. HISTORICAL BACKGROUND

16.     Central Michigan has been the home of the Saginaw Chippewa for centuries. The Saginaw Tribe is composed of three different bands: Swan Creek, Black River, and Saginaw. The Saginaw Tribe has maintained a continuous relationship with the United States through treaties. The United States negotiated and signed treaties with the Saginaw Tribe in 1807, 1819, 1836, 1837, 1838, 1855, and 1864. As federal Indian policy shifted in the 1850s from a policy of removal to a policy of creating reservations as permanent homes for the Indians, the Saginaw used the treaties of the 1855 and 1864 to establish and confirm a permanent home. As early as 1852, the chiefs and elders of the Saginaw Tribe told a Methodist missionary named George Bradley that they wanted "to help their children to a permanent home, say they shall die soon - and they would like to see their children have a permanent home." (See Affidavit of John Bowes ¶ 22) – hereinafter ("Bowes Affidavit") (Attached as Exhibit 13 to Tribe's Memorandum). In preparation for the 1855 Saginaw Treaty that would set apart lands for the Saginaw Chippewa, President Franklin Pierce signed an Executive Order on May 14, 1855, "withdrawing all of the vacant land in Isabella County" for the benefit of the Indians living in that area of Michigan. (Bowes Affidavit, ¶'s 3, 11).

17.     Commissioner of Indian Affairs George Manypenny and Indian Agent Henry Gilbert served as treaty commissioners for the August 2, 1855 treaty with the Saginaw Tribe. Article 1 of the treaty provided "the United States will withdraw from sale, for the benefit of said Indians", "including six adjoining townships of land in the County of Isabella, Michigan..." Later that year Manypenny addressed the government's 1855 treaty with the Saginaw Tribe in his annual report to Congress. By the treaty, he wrote "the Indians are to have assigned

permanent homes, and be hereafter confirmed to them, in small tracts in severalty". *Id.* at ¶¶12. By the early 1860s the federal government's intention to establish permanent homes for Indians had not changed, but commissioners of Indian affairs including William P. Dole, began to also refer to the land set apart by treaty as lands for the "exclusive use" of the Indians. *Id.* at ¶¶ 13 and 14.

18. The October 18, 1864 Treaty with the Saginaw Tribe reflected the ideas expressed by Commissioner Dole. The second article of that treaty specifically states: "The United States hereby agrees to set apart for the exclusive use, ownership, and occupancy of the said Chippewas, Swan Creek, and the Black River, all of the unsold lands within the six townships in Isabella County, reserved to said Indians by treaty of August 2, 1855...." The Saginaw Chippewa understood the terms of the 1855 and 1864 Treaties as fulfilling their desire for a permanent home. They also understood that they would be using the lands set aside for Indian purposes. *Id.* at ¶¶ 21 and 18.

19. During this time, and under the auspices of President Pierce's Executive Order and the 1855 and 1864 Treaties, the General Land Office noted in its tract records the townships in Michigan that were withdrawn from public sale. The tract books provided repeated references to parts of townships in Isabella County reserved for the Saginaw Chippewa. One example states that the northern half of a township surveyed at T14NR3W is "set apart for the exclusive use, ownership, and occupancy of the Indians - See Second Article Treaty of October 18, 1864". Earlier notes for the same tract book report that the northern half of the township is "reserved for Indian purposes by order of the President May 14, 1855." *Id.* at ¶¶ 5, 11. The Saginaw Tribe through its treaties then had secured a permanent home their reservation and the lands within that reservation were to be used for Indian purposes. As part of these treaty rights, the Saginaw Tribe

15

also understood that they would have a right to exclude certain individuals from their lands if they so chose. *Id*. at ¶ 23.

20.     The Treaties of 1855 and 1864 and the Executive Order of 1855 make it clear that the Saginaw Tribe had lands reserved to them for their exclusive use, ownership and occupancy. The wording of each document is clear about the intentions of the federal government in setting apart land for Indian purposes.   Moreover, over the course of several decades the federal government consistently confirmed the right of the Saginaw Chippewa to the exclusive use of tribal lands set apart for their use in Isabella County.  Because this land was set aside for the exclusive use of the Saginaw Chippewa, the government of the Tribe has certain rights and powers associated with establishment of the reservation.  The Saginaw Tribe's sovereign authority over its reservation lands contains the full range of governmental powers flowing from that sovereignty, combined with specific treaty based rights that came with establishment of the reservation. In particular, the Saginaw Chippewa Tribal Council has the authority to exclude non Indians based on its status as a sovereign government. This right and power is in accord with the intentions of federal policy, as made apparent in the treaties of 1855 and 1864, and the larger context of federal Indian policy of that time. *Id*. at ¶ 26.

21.     The Saginaw tribe's rights under the Saginaw treaties in the context of this action include the power to determine whether to permit the Board or a labor organization to enter, access, or engage in activities on Saginaw Tribal lands within the Isabella Reservation, which constitutes Indian Country. *See* 18 U.S.C. § 1151; Indian Lands under IGRA, 25 U.S.C. § 2703(4).

22.     The provisions of the 1855 and 1864 Saginaw Treaties remain in full force today. *Saginaw Chippewa Indian Tribe of Michigan v. Granholm*, CIV. 05-10296-BC, 2010 WL

5185114 (E.D. Mich. Dec. 17, 2010) *motion for relief from judgment denied*, 05-10296-BC, 2011 WL 1884196 (E.D. Mich. May 18, 2011).

## V. THE SAGINAW TRIBE'S SOVEREIGN RIGHT TO CONDUCT TRIBAL GOVERNMENT GAMING IS SECURED BY ITS INHERENT SOVEREIGN AUTHORITY, IGRA, AND ITS FEDERALLY APPROVED COMPACT WITH THE STATE OF MICHIGAN

23. The Saginaw Tribe possesses inherent sovereign authority to "[m]anage the use of [tribal] territory and resources by both members and nonmembers" and to "undertake and regulate economic activity" on Tribal territory. *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 335-36 (1983). That authority includes, *inter alia*, the right to undertake gaming activities on reservation lands when State public policy towards gaming is regulatory rather than prohibitory. *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987) (rejecting State argument that Pub. L. 280 provided it with jurisdiction over on-reservation tribal gaming activities). Tribal government operated gaming furthers "the congressional goal of Indian self-government, including its "overriding goal" of encouraging tribal self-sufficiency and economic development," *Id.* at 216 (quoting *Mescalero Apache*, 462 U.S. at 333-34), by providing revenue for the operation of tribal governments and the delivery of tribal services. *Id.* at 218-19. Simply stated, "[s]elf-determination and economic development are not within reach if the Tribes cannot raise revenues and provide employment for their members." *Id.* at 219. Under *Cabazon*, the right to conduct gaming is a governmental right of the Saginaw Tribe, held in its sovereign capacity.

24. In 1988, Congress enacted IGRA, which comprehensively regulates gaming conducted by tribal governments. Congress found in IGRA that "Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not

specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity." 25 U.S.C. § 2701(5). In enacting IGRA, Congress "intended to expressly preempt the field in the governance of gaming activities on Indian lands." S. Rep. No. 100-466, at 6 (1988), reprinted in 1988 U.S.C.C.A.N. 3071, 3076. Under IGRA, the right to conduct gaming is a governmental right of Saginaw Tribe held in its sovereign capacity.

25. The primary purposes of IGRA are to "provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments," 25 U.S.C. § 2702(1), and "to provide a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players." *Id.* at § 2702(2). Under IGRA, Indian gaming is a governmental activity and subject to the overarching tribal regulatory responsibility to oversee all tribal government gaming activities, to investigate and protect such activities from infiltration by organized crime and corruption, and to review key employees' associations.

26. Congress also found in IGRA that Indian tribes engage in gaming "as a means of generating tribal governmental revenue," *id.* at § 2701(1), and that "a principal goal of Federal Indian policy is to promote tribal economic development, tribal self-sufficiency, and strong tribal government." *Id.* at § 2701(4). In accordance with that policy, IGRA requires that tribal gaming revenues be used only to fund tribal government operations and programs, provide for the general welfare of the tribe, promote tribal economic development, and for charitable and local

governmental purposes. *Id.* at § 2710(b)(2)(B) This effectively taxes tribal government gaming at a rate of one hundred percent.

27.     At the time IGRA was enacted, the National Labor Relations Board recognized that Indian tribes, as governmental entities recognized by the United States, were not subject to the NLRA. *Fort Apache Timber Co.,* 226 N.L.R.B. 503 (1976). At that time, it was also established that States were exempt from the Act. *See* 29 U.S.C. § 152(2). Nothing in IGRA purported to alter or affect these exemptions.

28.     In order to conduct class II and class III gaming under IGRA, *see* 25 U.S.C. §§ 2703(7) (defining class II gaming), 2703(8) (defining class III gaming), an Indian tribe must enact an ordinance regulating that activity, and that ordinance must be approved by the Chairman of the National Indian Gaming Commission. *Id.* at § 2710(b)(1)(B), (d)(1)(A). The ordinance must provide, inter alia, for an adequate system that requires background investigations of primary management officials and key employees of the gaming enterprise, as well as ongoing oversight of such officials, *id.* at § 2710(b)(2)(F)(i); licensing of primary management officials and key employees, *id.* at § 2710(b)(2)(F)(ii); and a standard for determining ineligibility for employment based on a person's activities, prior criminal record, or associations, in instances that pose a threat to the public interest or effective regulation, *id.* at § 2710(b)(2)(F)(ii).

29.     The Saginaw Tribe's Gaming Code (attached as <u>Exhibit 2</u> to Plaintiff's Memorandum) was submitted on October 12, 1993 and subsequently approved by the National Indian Gaming Commission.  The application of the NLRA would directly conflict with the Tribe's gaming ordinance. Title IX of the Tribal Gaming Code regulates the SECR gaming facility. Section 1 of the Tribe's Gaming Code provides as its Finding, Purpose and Policy. Section 1.1 of the Tribe's Gaming Code provides in part:

1.1.1 Tribal regulation and control of gaming activity within the jurisdiction of the Saginaw Chippewa Indian Tribe is essential for the protection of public health and welfare, and the interests of the Tribe and the residents of and visitors to the tribal community.

1.1.7 The Tribe is vigorously pursuing its goal of self-sufficiency and self-determination through the development of tribal businesses and enterprises. Because the Isabella Reservation lacks income-generating natural resources and because the Tribe's tax base is almost non-existent, the Tribe must rely on tribal business development to raise the funds necessary to expand its social, health, and education programs, increase employment and improve its on-reservation economy. This effort has recently become increasingly important as a result of cutbacks in federal and state funding and the increased costs of self-government. It is therefore essential that the Tribe develop new and expanded sources of revenue to support its ever-increasing governmental needs and to provide much needed employment and training for tribal members.

Section 1.2 of the Tribe's Gaming Code states as its purpose in part:

1.2.1 Regulate, control, and license the operation of all gaming within the jurisdiction of the Tribe.

1.2.3 Ensure that the operation of tribally regulated gaming will continue as a means of generating tribal revenue.

1.2.5 Promote and strengthen tribal economic development and self-determination and enhance employment opportunities for its members.

1.2.7 Ensure that all gaming revenue is used for the benefit of the Tribe and the Reservation community.

The stated policy of the Tribal Gaming Code as provided as Section 1.4 provides:

1.4 Tribal Gaming Policy. The establishment, promotion, and operation of gaming is necessary and desirable, provided that such gaming is regulated and controlled by the Tribe pursuant to tribal and federal law and any tribal-state gaming compact entered into pursuant to the Indian Gaming Regulatory Act, and that all proceeds of such gaming are used for the benefit of the Tribe as required by the Indian Gaming Regulatory Act and tribal law. When operated in accordance with the provisions of this Code,

such gaming will be conducive to the general welfare of all residents of the Reservation.

The Tribal Gaming Code establishes a Gaming Commission responsible for oversight, regulation and enforcement of the SECR. The Gaming Commission is comprised of six Tribal members appointed by the Tribal Council to serve a four year term.

30. In enacting IGRA's provisions for class III gaming, Congress "grant[ed] the States a power that they would not otherwise have, viz., some measure of authority over gaming on Indian lands." *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 58 (1996). A Tribal-State gaming compact is required to authorize class III gaming. 25 U.S.C. § 2710(d)(1)(C). "Congress struggled through several sessions to find a statutory scheme which would incorporate and balance the interests of tribes, states, and the federal government. The tribal-state compact was the device it ultimately chose." *Gaming Corp. of Am. v. Dorsey & Whitney*, 88 F.3d 536, 549 (8th Cir. 1996).

31. Under IGRA, the regulation of tribal government class III gaming is to be accomplished by the terms of the Tribal-State compact. 25 U.S.C. § 2710(d)(3)(A) (compacts "govern[ ] the conduct of class III gaming activities"). IGRA lists comprehensively and exclusively the subjects that the terms of a compact may relate to, stating that:

(C) Any Tribal-State compact negotiated under subparagraph (A) may include provisions relating to —

(i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity

(ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;

21

(iii) the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity;

(iv) taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the State for comparable activities;

(v) remedies for breach of contract;

(vi) standards for the operation of such activity and maintenance of the gaming facility, including licensing; and

(vii) any other subjects that are directly related to the operation of gaming activities. *Id.* at § 2710(d)(3)(C).

32. Congress relied on Tribal-State compacts to regulate class III gaming, as is explained in the Senate Report accompanying the Act:

> [T]he Committee notes that there is no adequate Federal regulatory system in place for class III gaming, nor do tribes have such systems for the regulation of class III gaming currently in place. Thus a logical choice is to make use of existing State regulatory systems, although the adoption of State law is not tantamount to an accession to State jurisdiction. The use of State regulatory systems can be accomplished through negotiated compacts but this is not to say that tribal governments can have no role to play in regulation of class III gaming — many can and will.

S. Rep. No. 100-446 at 13 (1988), reprinted in 1988 U.S.C.C.A.N. 3071, 3083-84. IGRA further provides that [n]othing in this subsection shall impair the right of an Indian tribe to regulate class III gaming on its Indian lands concurrently with the State, except to the extent that such regulation is inconsistent with, or less stringent than, the State laws and regulations made applicable by any Tribal-State compact entered into by the Indian tribe under paragraph (3) that is in effect." 25 U.S.C. § 2710(d)(5).

33. Tribal-State compacts are subject to approval by the Secretary of the Interior. *Id.* at § 2710(d)(3)(B). Once a valid compact is in effect, it has the force of federal law. *See id.* §

2710(d)(2)(C), (d)(3)(B). The SECR is a wholly owned chartered governmental subdivision of the Tribe operated pursuant to the IGRA, the Saginaw Chippewa Tribal Gaming Code and Tribe's gaming compact with the State of Michigan. The Gaming Compact between the Tribe and the State of Michigan was approved by the Secretary of Interior on November 19, 1993 (Attached as Exhibit 1 to Tribe's Memorandum). The Compact remains in full force and effect and operates pursuant to its own terms, subject to renegotiation after twenty years as provided by Section 12 of the Compact. The stated purposes of the Compact are provided at Section 1 and include the following:

> (D) fulfilling the purpose and intent of IGRA by providing for tribal gaming as a means of generating tribal revenues, thereby promoting tribal economic development, tribal self-sufficiency and strong tribal government
>
> (E) To provide tribal revenues to fund tribal government operations or programs, to provide for the general welfare of the Tribe and its members and for other purposes allowed under IGRA.

34. The SECR is located on Indian Lands as defined by the Compact. Indian Lands are defined by the Compact as all lands currently within the limits of the Tribe's Reservation. Section 2(B)(1). The SECR is located on lands within the boundaries of the Isabella Indian Reservation that were taken into trust by the United States. This Court issued an Order on December 17, 2010 recognizing the boundaries of the Isabella Indian Reservation established by Executive Order of 1855 and by the Treaties of 1855 and 1864. The Gaming Compact provides the Tribe with the right to conduct Class II and Class III gaming at the SECR. The Gaming Compact recognizes the exclusive authority of the Tribe to regulate gaming activities at the SECR. The Gaming Compact provides at section 4:

Regulation of Class III Gaming

23

(A) The Tribe has enacted a comprehensive gaming regulatory ordinance governing all aspects of the Tribe's gaming enterprise. This Section 4 is intended to supplement, rather than conflict with the provisions of the Tribe's ordinance. To the extent any regulatory requirement of this Compact is more stringent or restrictive than a parallel provision of the Tribe's ordinance, as now or hereafter amended, this Compact shall control.

(B) The Tribe shall license, operate, and regulate all Class III gaming activities pursuant to this Compact, tribal law, IGRA, and all other applicable federal law. This shall include but not be limited to the licensing of consultants (except legal counsel with a contract approved under 25 U.S.C. §§ 81 and/or 476), primary management officials, and key officials of each Class III gaming activity or operation. Any violation of this Compact, tribal law, IGRA, or other applicable federal law shall be corrected immediately by the Tribe.

...

(K) The regulatory requirements set forth in this section of this Compact shall be administered and enforced as follows:

(1) The Tribe shall have responsibility to administer and enforce the regulatory requirements.

The Gaming Compact established the Tribe as the regulatory authority over the SECR and specifically acknowledges the authority of the Tribe's gaming laws and IGRA over the Tribe's gaming enterprise.

## COUNT I

35. The Saginaw Tribe realleges and incorporates by reference paragraphs 1 through 34 as if fully set forth herein.

36. The Saginaw Tribe conducts all of its tribal governmental gaming regulation, operations, and management activities, including its operations of the SECR as an exercise of the Tribe's sovereign authority through the Tribal Council, and in the exercise of the Tribe's Treaty right of self-government, inherent sovereign authority, and rights and obligations under IGRA, the Compact, and the Saginaw Tribe's laws. The NLRA therefore does not apply to the Tribe

absent express congressional authorization. *Dobbs v. Anthem Blue Cross and Blue Shield*, 600 F.3d 1275, 1283-84 & n.8 (10th Cir. 2010). Congress has not expressly authorized the application of the NLRA to the Tribe, and the NLRA is therefore inapplicable to the Tribe. Accordingly, the Board's attempt to apply the NLRA to the Tribe, including its activities at SECR, is *ultra vires*.

37. The Saginaw Tribe faces immediate and irreparable harm from the Board's *ultra vires* attempt to apply the NLRA to the Tribe in the absence of express congressional authorization. The Board's imminent prosecution of the UAW's unfair labor practice charges against the Saginaw Tribe would violate the Tribe's rights of self-government, and inherent sovereign authority, which the Tribe exercises through the operation, management, and regulation of all activities at its gaming facilities including the SECR.

38. The Saginaw Tribe has no adequate remedy at law.

## COUNT II

39. The Saginaw Tribe realleges and incorporates by reference paragraphs 1 through 38 as if fully set forth herein.

40. The UAW has not been authorized by the Saginaw Tribe to enter, access, or engage in activities at the Tribe's facilities on Isabella Reservation. Nor has the UAW been subject to a background investigation conducted by the Tribe under IGRA, the Compact, and Saginaw Gaming Ordinance. The UAW has no right of entry or access to the Saginaw Tribe's facilities; nor does the UAW have a right to engage in any activity at any of the Saginaw Tribe's facilities, either by its physical presence or electronically or by any other media form. Accordingly, the UAW has no right to obtain the names and addresses of the Saginaw Tribe

employees, or to communicate with such employees using information furnished by the Saginaw Tribe.

41.     Applying the NLRA to the Saginaw Tribe so as to require that the UAW be granted such entry, access, rights to engage in activity, and to be provided the information requested by the Board, would violate the Tribe's Treaty and federal common law rights of self-government and power to exclude, the Tribe's inherent sovereign right to undertake and regulate economic activities within its territory, its right to impose conditions on participation in tribal economic activity, and its right to apply and enforce its gaming laws under IGRA and the Compact and Charter.

42.     Applying the NLRA to the Saginaw Tribe would make the Tribe's Treaty rights of self-government and power to exclude, its inherent sovereign authority, the Compact, Charter, gaming ordinance and personnel ordinances, all of which it relies on to operate, manage and regulate activities at the Soaring Eagle location, subject to the requirements of the collective bargaining process imposed by the NLRA. These requirements include the obligation to engage in collective bargaining, 29 U.S.C. §§ 157-159, concerning "wages, hours, and other terms and conditions of employment, . . ." *Id.* at § 158(d). As a result, the Tribe would in effect be required to bargain for the retention of its rights of self-government and power to exclude, inherent sovereign authority, and the applicability of its laws. For example, the continued application of the Tribe's employment preference for tribal members at the Soaring Eagle location would be dependent on the bargaining process. The result of the collective bargaining process would be a *de facto* statute governing conditions of employment that would replace the Tribe's laws, and thereby divest the Tribe of its rights as a sovereign. Relegating the Tribe's sovereignty to the collective bargaining process in the absence of express Congressional authorization violates

federal law. "Requiring the consent of the [Teamsters] deposits in the hands of the excludable non-Indians the source of the tribe's power, when the power instead derives from sovereignty itself. Only the Federal Government may limit a tribe's exercise of its sovereign authority." *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 147 (1982) (citing *United States v. Wheeler,* 435 U.S. 313, 322 (1978)). "[N]either the legislative history of the NLRA, nor its language, make any mention of Indian tribes," *NLRB v. Pueblo of San Juan,* 276 F.3d 1186, 1196 (10th Cir. 2002). And "[s]ilence is not sufficient to strip Indian tribes of their retained inherent authority to govern their own territory." *Id.* (citations omitted).

43.     Applying the NLRA to the Saginaw Tribe would also guarantee tribal government employees the right to strike. 29 U.S.C. §§ 157 (right of employees to engage in "concerted activities for the purpose of collective bargaining or other mutual aid and or protection") §§ 158(a)(1) (providing for enforcement of that right by the Board through its prosecution of an unfair labor practice charge). Recognizing the right to strike would divest the Tribe of its right of self-government by conferring on the representatives selected by its employees, *See Id.* § 159(a), the power to bring the tribal government to a halt if their collective bargaining demands are not met. A strike by Saginaw Tribal employees working at the SECR location would jeopardize the Tribe's ability to operate its government, protect the safety, health, and welfare of its members, residents, and visitors, and provide Tribal services, all of which the Tribe does in the exercise of its Treaty rights of self-government and inherent sovereign authority, and in accordance with IGRA and its own laws. *See* 25 U.S.C. §§ 2702(1) (stating IGRA's purpose as promoting tribal economic development, self-sufficiency, and strong tribal governments), 2710(b)(2)(B) (identifying governmental purposes for which gaming revenues may be expended). Conferring that political power on the employees' representatives would divest the

Tribe of its right of self-government. Furthermore, to eliminate the threat of a strike would require the consent of the UAW through collective bargaining. 2, 9 U.S.C. §§ 157, 158(d). As a result, the Tribe's ability to continue to meet its governmental responsibilities would depend on the outcome of the bargaining process. Such a result is barred by the Saginaw Tribe treaty right to exclude, rights of self-governance, inherent sovereign authority, and rights under IGRA and the Compact and Charter.

44.     Applying the NLRA to the Tribe would also subject the Tribe to the Board's power to determine the "unit appropriate for the purpose of collective bargaining." 29 U.S.C. § 159(b). This would divest the Tribe of the right to determine, in the exercise of its treaty right of self-government and inherent sovereign authority, the manner in which it will engage in economic activity.

45.     Subjecting the Tribe to the NLRA would require it to bargain exclusively with representatives selected by its employees, *id.* at § 159(a), which would divest the Tribe of its power to determine who may enter its territory, who it will engage in economic activity with, and its power to exclude, and deprive the Tribe of the right to administer and enforce its background check and licensing processes (*e.g.*, the Saginaw Gaming Ordinance Title IX), which are required by IGRA, 25 U.S.C. § 2710(b)(2)(F), and the Compact. At the same time, the Tribe would remain responsible for regulating gaming by shielding it from "organized crime and other corrupting influences." 25 U.S.C. § 2702(2). This truly imposes an unacceptable choice on the Tribe.

46.     Applying the NLRA to the Tribe would also subject the Tribe's personnel rules contained in its Associate Handbook and gaming laws to the jurisdiction of the NLRB, 29 U.S.C. §§ 158, 160. This would deprive the Tribe of its exclusive right to administer and enforce its

laws, and its right to adjudicate disputes arising under those laws, all of which are held by the Tribe under federal law.

47.      The NLRA does not abrogate the Saginaw Tribe's treaty rights of self-government and power to exclude, nor does it divest the Saginaw Tribe of its inherent sovereign authority to engage in and regulate economic activity, nor does it deprive the Tribe of its right to make its own laws and be ruled by them.  The NLRA therefore does not apply to the Saginaw Tribe, including the Tribe's operations at SECR, the Board has no authority to apply the NLRA to the Saginaw Tribe and its attempt to do so is *ultra vires*.

48.      Congress did not intend the NLRA to apply to Indian tribes.  Nor did Congress intend the NLRA to abrogate tribal treaty rights of self-government, including those held by the Saginaw Tribe, or tribal inherent sovereign authority to engage in and regulate economic activity.  There is no language in the NLRA that abrogates those rights.  The NLRA therefore does not apply to the Saginaw Tribe and the Board has no authority to apply it to the Saginaw Tribe.

49.      The Saginaw Tribe faces immediate and irreparable harm from the Board's *ultra vires* attempt to apply the NLRA to the Tribe, including the Board's imminent prosecution of the UAW's unfair labor practices charges against the Tribe.  The Board's action would violate the Tribe's rights under IGRA, the Compact and the Tribe's laws implementing IGRA and the Compact, and would subject the Tribe to a proceeding over which the Board lacks subject matter jurisdiction.

50.      The Saginaw Tribe has no adequate remedy at law.

## COUNT III

51.     The Saginaw Tribe realleges and incorporates by reference paragraphs 1 through 50 as if fully set forth herein.

52.     Under IGRA, the Compact has the force of federal law. 25 U.S.C. §§ 2710(d)(2)(C), 2710(d)(3)(B). IGRA, the Compact, and the Tribe's laws implementing IGRA and the Compact, comprehensively and exclusively regulate all activities at the Soaring Eagle location.  None of those laws makes the NLRA applicable to the Saginaw Tribe's exercise of its sovereign authority through the operation, management and regulation of activities at the Soaring Eagle location.

53.     Application of the NLRA to the Saginaw Tribe's regulation, operation, and management of Soaring Eagle would violate the Tribe's rights under IGRA, the Compact, and its laws implementing the Compact.

54.     Application of the NLRA to the Saginaw Tribe's regulation, operation, and management of Soaring Eagle is barred by IGRA, the Compact, and by the Tribe's laws enacted pursuant to IGRA and the Compact.  The Board's action would, *inter alia*, restrict the regulation and review of key employees under IGRA, the Compact, and the Tribe's laws.

55.     The Saginaw Tribe faces immediate and irreparable harm from the Board's *ultra vires* attempt to apply the NLRA to the Tribe, including the Board's imminent prosecution of the UAW's unfair labor practices charges against the Tribe  The Board's action which would violate the Tribe's rights under IRA, the Compact, and the Tribe's laws implementing IGRA and the Compact, and would subject the Tribe to a proceeding over which the Board lacks subject matter jurisdiction.

56.     The Saginaw Tribe has no adequate remedy at law.

## COUNT IV

57.     The Saginaw Tribe realleges and incorporates by reference paragraphs 1 through 56 as if fully set forth herein.

58.     The trust relationship between Indian tribes and the United States, *see Cherokee Tribe v. Georgia,* 30 U. S. (5 Pet.) 1, 17 (1831) (establishing that Indian tribes are domestic dependent Tribes, and that their relations with the United States are subject to the trust responsibility); *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 556-57 (1832) (bringing Indian tribes' right of self-government, as well as their treaty and territorial rights, within the scope of the trust responsibility), extends to the entire federal government, *Parravano v. Babbitt,* 70 F.3d 539, 546 (9th Cir. 1995), and thus includes the NLRB. Under the trust responsibility, the NLRB has a duty to consult with Indian tribes on federal actions that may affect their treaty right of self-government and inherent sovereign authority. The trust responsibility mandates a high degree of procedural fairness in the government's dealings with Indian tribes, *see Morton v. Ruiz,* 415 U.S. 199, 236 (1974), and includes a special duty to consult with tribes or Indians to ensure their understanding of federal actions that may affect their rights and to ensure federal consideration of their concerns and objections with regard to such actions. *See, e.g., HRI, Inc. v. EPA,* 198 F.3d 1224, 1245 (10th Cir. 2000) ("in some contexts the fiduciary obligations of the United States mandate that special regard be given to the procedural rights of Indians by federal administrative agencies") (quoting Felix S. Cohen, Handbook of Federal Indian Law 225 (1982)). As the court explained in *Okanogan Highlands Alliance v. Williams,* "[in practical terms, the trust relationship gives rise to a procedural requirement that the federal government 'at the very least . . . investigate and consider the impact of its action upon a potentially affected Indian tribe.'" No.

CIV. 97-8064E, 1999 WL 1029106, at *16 (D. Or. Jan 12, 1999) (*quoting Northern Cheyenne v. Hodel,* No. CB 82-116-BLG, 112 ILR 3065, 3071 (D. Mont. 1985), *remanded for modification of injunction,* 851 F.2d 1152 (9th Cir. 1988)), aff'd, 236 F.3d 468 (9th Cir. 2000)). "This duty requires the government to consult with an Indian tribe in the decision making process in an effort to avoid harm to reserved rights." *Id.* at *16 (citations omitted). *See also Midwater Trawlers Coop. v. U.S. Dept. of Commerce,* 139 F. Supp. 2d 1136, 1145-46 (W.D. Wash. 2000) (right of federal government to consult with Indian tribes on treaty rights issues is well-grounded in the trust responsibility), aff'd in part and rev'd in part on unrelated grounds, 282 F.3d 710 (9th Cir. 2002).

59.     President Obama's November 5, 2009 Memorandum ("President's Consultation Memorandum") directs the full implementation of Executive Order 13,175, Consultation and Coordination with Indian Tribal Governments, 65 Fed. Reg. 67,249 (2000) ("EO 13,175"), which requires that federal agencies consult with Indian tribes on matters that affect their interests, and is based on the federal trust responsibility.  The Board has not implemented EO 13,175 as required by the President's Consultation Memorandum.

60.     The Board's *San Manuel* decision (as affirmed by the D.C. Circuit) and the process used by the Board to implement that decision have a direct effect on tribal treaty rights of self-government and inherent sovereign authority to engage in economic activity.  Pursuant to the *San Manuel* decision, the NLRB has also assumed authority to decide, on a case-by-case basis, the limits of tribal treaty rights of self-government and inherent sovereign authority, as well as when an Indian tribe must do business with third parties, and on what terms.

61.     Under the federal trust responsibility, the treaties between Indian tribes and the United States and EO 13,175, the Board was required to consult with Indian tribes, including the

Saginaw Tribe, before deciding to abandon its 30-year rule that on-reservation tribal enterprises are exempt from the NLRA, and replace it with the *Tuscarora-Coeur d'Alene* analysis. The Board expressly recognized in *San Manuel* that its prior precedent would compel dismissal under the NLRA's exemption for "political subdivisions" of a State, 341 N.L.R.B. at 1056-57 (citing *Fort Apache Timber Co.*, 226 N.L.R.B. 503 (1976)), and acknowledged that it was necessary to consider federal Indian policy in reaching its result. *Id.* at 1059. Yet the Board did not attempt to consult with Indian tribes before deciding to reexamine the application of the NLRA to Indian tribes, and the impact of federal Indian policy on that re-examination.

62.     Under the federal trust responsibility, the treaties between Indian tribes and the United States, and EO 13,175, the Board was required to consult with Indian tribes, including the Saginaw Tribe, before deciding to assert jurisdiction over on-reservation tribal enterprises on a case-by-case basis, rather than through rule-making. The Board did not consult with Indian tribes on any aspect of its implementation of the two-step process that the *San Manuel* decision created, including whether to implement these changes on a case-by-case basis, rather than through rule-making.

63.     The Board had a duty under the federal trust responsibility, the Saginaw treaties and EO 13,175 to consult with the Saginaw Tribe before initiating the unfair labor practice proceedings against the Tribe at issue in case. The NLRB did not initiate any such consultation.

64.     The Board's failure to consult with Indian tribes at any time prior to or after changing its position in 2004 on the applicability of the NLRA to Indian Tribes, its failure to consult with Indian tribes in the course of implementing the authority it claims under the San Manuel ruling, and its failure to consult with the Saginaw Tribe before initiating unfair labor practice charges against the Tribe, violates the Board's federal trust obligation to consult with

Indian tribes before taking action that will affect tribal Treaty rights of self-government and inherent sovereign authority.

**WHEREFORE,** the Saginaw Tribe respectfully asks this Court to enter judgment in its favor and to:

I.      Issue a declaratory judgment against Defendants declaring that the NLRA does not apply to the Saginaw Tribe, the Tribe's operations at its gaming facilities including SECR, or any of the Saginaw Tribe's officials, agents, or representatives.

II.     Enjoin the Board, the individual members of the Board in their official capacity, and any of the Board's agents, officers, employees, or representatives from taking any action to apply the National Labor Relations Act to the Saginaw Tribe, the Tribe's operation of the SECR, or any of the Tribe's officials, agents or representatives.

III.    Award the Saginaw Tribe its costs, and such other relief as this Court may deem just or equitable.

Dated: October 21, 2011

s/ William A. Szotkowksi
William A. Szotkowski (MN # 161937)
Andrew Adams III (WI # 1052371)
Jacobson, Buffalo, Magnuson,
Anderson & Hogen, P.C.
335 Atrium Office Building
1295 Bandana Boulevard
St. Paul, Minnesota  55108
Tele:  (651) 644-4710
Fax:  (651) 644-5904
E-mail:  bszot@jacobsonbuffalo.com;
        aadams@jacobsonbuffalo.com

Sean Reed (MI # P62026)
General Counsel
Saginaw Chippewa Indian Tribe
7070 East Broadway
Mt. Pleasant, Michigan 48858
Tele:  (989) 775-4032
Fax:  (989) 773-4614
E-mail:  sreed@sagchip.org