UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SAGINAW CHIPPEWA INDIAN TRIBE
       OF MICHIGAN,

       Plaintiff,

v.

       Case No. 11-14652
       Honorable Thomas L. Ludington

THE NATIONAL LABOR RELATIONS BOARD,
MARK PEARCE, and BRIAN HAYES,

       Defendants.
_____/

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR A
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION
AND GRANTING DEFENDANTS' MOTION TO DISMISS**

      This case involves competing claims to jurisdiction — more precisely, the lack thereof. The Saginaw Chippewa Indian Tribe of Michigan filed suit in this Court to enjoin the National Labor Relations Board from applying the National Labor Relations Act, 29 U.S.C. §§ 151–69, to the Tribe's casino operations. Moving for a preliminary injunction, the Tribe contends that it is not subject to the Board's jurisdiction as the Act does not expressly provide that it applies to Indian tribes. The Board, in turn, moves to dismiss the Tribe's complaint, contending this Court lacks jurisdiction because the Act "requires parties to exhaust administrative remedies before the Board and an appropriate court of appeals." Whether the Tribe is correct that the Board lacks jurisdiction or the Board is correct that this Court lacks jurisdiction (or, indeed, whether they are both correct) are issues that will ultimately be resolved by the Sixth Circuit, regardless of what this Court decides. Nevertheless, this Court concludes that the Board has the better argument regarding this Court's jurisdiction — more precisely, the lack thereof.

Pursuant to 29 U.S.C. § 160, the Tribe must first exhaust its administrative remedies before the Board. Only then may the Tribe appeal to the courts, and the appeal will not lie in this Court, but in the court of appeals. And although the Sixth Circuit recognizes a narrow exception to the exhaustion requirement of § 160, it requires "both a showing that the Board acted in excess of its delegated powers *and* that the aggrieved party would be 'wholly deprived' of its statutory rights." *Detroit Newspaper Agency v. NLRB*, 286 F.3d 391, 397 (6th Cir. 2002) (emphasis in original) (citing *Bd. of Governors of the Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991)). Parties are not "wholly deprived" of their "statutory rights" when they "have an opportunity to raise their arguments in the court of appeals under § 160(f)." *Id*. (citing *Leedom v. Kyne*, 358 U.S. 184 (1958)). Here, the Tribe will have the opportunity to raise its arguments in the court of appeals. Accordingly, the Tribe's motion will be denied, the Board's motion will be granted, and the Tribe's complaint will be dismissed.

## I.

The Saginaw Chippewa Indian Tribe of Michigan is a federally recognized Indian tribe. From 1807 to 1864, the Tribe entered into several treaties with the United States. The 1864 Treaty established the Isabella Reservation in Isabella County, Michigan, providing that the land was set aside for the "exclusive use, ownership, and occupancy of the Saginaw Chippewa." More than a century passed.

In 1988, Congress enacted the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–21, to establish "a statutory basis for the operation and regulation of gaming by Indian tribes." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 48 (1996). "The Act divides gaming on Indian lands into three classes — I, II, and III — and provides a different regulatory scheme for each class." *Id*. "Class I gaming" includes, inter alia, "social games solely for prizes of minimal

value." § 2703(6). "Class II gaming" includes "bingo" and "card games," § 2703(7)(A), but does not include "such things as slot machines, casino games, banking card games, dog racing, and lotteries." *Seminole Tribe*, 517 U.S. at 48. Class III gaming, "the most heavily regulated of the three classes," includes any gaming that does not fall into class I or II. *Id*.

"Class I gaming on Indian lands is within the exclusive jurisdiction of the Indian tribes." § 2710(a)(1). Class II and III gaming, in contrast, requires that an Indian tribe enact, and the Chairman of the National Indian Gaming Commission approve, an ordinance regulating the gaming activity. § 2710(b), (d). Class III gaming, moreover, requires "a Tribal-State compact entered into by the Indian tribe and the State" approved by the Secretary of the Interior. § 2701(d)(1)(C).

In 1993, the Tribe enacted its gaming ordinance, which was approved by the Chairman of the National Indian Gaming Commission. Also in 1993, the Tribe and the State of Michigan entered into a gaming compact; it was approved by the Secretary of the Interior. The Tribe then began to operate the Soaring Eagle Casino and Resort on the Isabella reservation, offering class II and III gaming. The Tribe does not disclose what percentage of the casino's employees and customers are members of the Tribe. What percentage of the Tribe's overall revenue is derived from the gaming similarly not disclosed. The Tribe does, however, attach the casino's "charter," which provides in pertinent part that the casino "is a tribal public body and a subordinate, wholly-owned governmental subdivision of the Tribe and has been delegated the right to exercise one or more of the substantial governmental functions of the tribal government."

Over the past several years, various unions have attempted to organize at the casino. In October 2007, the casino's housekeeping department filed a petition for election with the Board. The Tribe asserted that the Act did not apply to Indian tribes. The Board rejected that

conclusion. The Tribe did not seek relief (injunctive or otherwise) in this Court or the courts of appeals. In November 2007, the casino's security department filed a petition for union election. The Board authorized the election. Following negotiations, the petition was withdrawn. In December 2007, the Teamsters union filed a charge with the Board. In September 2008, the parties settled.

In April 2011, the charge giving rise to this litigation was filed when a former casino employee, Susan Lewis, complained to the Board that the Tribe had terminated her for violating the casino's no solicitation policy. The Board's regional director investigated and issued an administrative complaint alleging, inter alia, that the Tribe's no solicitation policy violates the Act. In September 2011, the Tribe filed an answer by special appearance, disputing the Board's jurisdiction over the Tribe.

On October 21, 2011, the Tribe filed a complaint against the Board in this Court. ECF No. 1. The same day, the Tribe filed a motion for a temporary restraining order and preliminary injunction, seeking to enjoin the Board from proceeding. ECF No. 5. On October 28, 2011, the Board filed a motion to dismiss for lack of subject matter jurisdiction. ECF No. 10. The motions of the Tribe and the Board are now pending before the Court. Because the Board's motion is dispositive of the issues presented, it is taken up first.

## II.

A motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) may be based on either a facial attack or a factual attack on the allegations of the complaint. *Tri-Corp Mgmt. Co. v. Praznik*, 33 F. App'x 742, 745 (6th Cir. 2002). When the Court reviews a factual attack on subject matter jurisdiction, no presumption of truthfulness applies to the factual allegations of the complaint. *United States v. Ritchie*, 15 F.3d

592, 598 (6th Cir. 1994). A plaintiff must demonstrate jurisdiction in order to survive the motion. *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990).

### III.

"Since it was first enacted in 1935," the Supreme Court recounts, "the National Labor Relations Act has empowered the National Labor Relations Board 'to prevent any person from engaging in any unfair labor practice . . . affecting commerce.' By this language and by the definition of 'affecting commerce' elsewhere in the Act, Congress meant to reach to the full extent of its power under the Commerce Clause." *Guss v. Utah Labor Relations Bd.*, 353 U.S. 1, 3 (1957) (footnotes omitted) (citing *NLRB v. Fainblatt*, 306 U.S. 601, 606–07 (1939)). The Commerce Clause, in turn, provides that "Congress shall have the power . . . [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. 1, § 8, cl. 3.

"The declared purpose of the National Labor Relations Act is to diminish the causes of labor disputes burdening and obstructing interstate and foreign commerce." *Myers v. Bethlehem Shipbuilding*, 303 U.S. 41, 44 (1938). To further this objective, "[t]he Act establishes a framework within which the Board is to determine whether proscribed practices would in particular situations adversely affect commerce when judged by the full reach of the constitutional power of Congress." *NLRB v. Reliance Fuel Corp.*, 371 U.S. 224, 226 (1963) (internal quotation marks omitted) (quoting *Polish Nat. Alliance of United States of N. Am. v. NLRB*, 322 U.S. 643, 648 (1944)). Specifically, the Act "defines acts of an employer that shall be deemed 'unfair labor practices,' and confers upon a five-member Board certain limited powers to prevent such practices." *Little River Band of Ottawa Indians v. NLRB*, 747 F. Supp. 2d 872, 885 (W.D. Mich. 2010) (internal citation omitted) (citing 29 U.S.C. §§ 153, 155, 158).

"The term 'employer,'" § 2(2) of the Act provides, "includes any person acting as an agent of an employer, directly or indirectly, but shall not include the United States or any wholly owned Government corporation, or any Federal Reserve Bank, or any State or political subdivision thereof, or any person subject to the Railway Labor Act." 29 U.S.C. § 152(2). This definition, as its broad language suggests, "vests jurisdiction in the Board over any 'employer' doing business in this country save those Congress excepted with careful particularity." *Little River Band of Ottawa Indians*, 747 F. Supp. at 885 (quoting *State Bank of India v. NLRB*, 808 F.2d 526, 531 (7th Cir. 1986)). "Indian tribe" is not among the entities expressly "exempted with careful particularity." *See NLRB v. Pueblo of San Juan*, 276 F.3d 1186, 1192 (10th Cir. 2002) (en banc) (noting "that neither the legislative history of the [Act], nor its language, make any mention of Indian tribes").

Section 10 of the Act vests jurisdiction in specific fora for evaluating whether an employer is engaging in an unfair trade practice. 29 U.S.C. § 160; *see generally* U.S. Const. art. III, § 1. The process begins when the Board receives a charge that an employer is engaging in an "unfair labor practice." *See* § 158(a) (defining unfair labor practices). The Board issues a complaint to the employer "containing a notice of hearing before the Board." § 160(b). At the hearing, the Board is empowered to take evidence, "so far as practicable, . . . in accordance with the rules of evidence applicable in the district courts of the United States under the rules of civil procedure for the district courts of the United States." *Id*. "If upon the preponderance of the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice," § 10 continues, "then the Board shall state its findings of fact and shall issue and cause to be served on such person an order

requiring such person to cease and desist from such unfair labor practice." § 160(c). The Board's order, however, is not self-enforcing. To enforce it, the Board must instead

> petition any court of appeals of the United States, or if all the courts of appeals to which application may be made are in vacation, any district court of the United States, within any circuit or district, respectively, wherein the unfair labor practice in question occurred or wherein such person resides or transacts business, for the enforcement of such order and for appropriate temporary relief or restraining order, and shall file in the court the record in the proceedings.

§ 160(e). Significantly, "Upon the filing of the record with it the jurisdiction of the court shall be exclusive." *Id*.

Likewise, "Any person aggrieved by a final order of the Board . . . may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in[,] . . . or in the United States Court of Appeals for the District of Columbia." 29 U.S.C. § 160(f). Thus, the Act establishes a judicial review process — but, significantly, confers jurisdiction on the court of appeals, not the district courts.

"The District Court is without jurisdiction to enjoin hearings," Justice Louis Brandeis explained shortly after the Act's enactment, "because the power to prevent any person from engaging in any unfair practice affecting commerce has been vested by Congress in the Board and the Circuit Court of Appeals." *Myers v. Bethlehem Shipbuilding*, 303 U.S. 41, 48 (1938) (internal quotation marks omitted) (quoting H.R. Rep. 1147, 74th Cong., 1st Sess., at 24 (1935)); *see also Zipp v. Geske & Sons, Inc.*, 103 F.3d 1379, 1382 (7th Cir. 1997) ("It is well settled that a district court has no jurisdiction to enjoin unfair labor practice hearings before the NLRB." (citing *Myers*)).

In *Myers*, for example, the employer brought suit in the district court to enjoin the Board's hearing, arguing that it was not subject to the Act because it was not engaged in either

interstate or foreign commerce. 303 U.S. at 50. Declining to accept the employer's argument, the Court wrote: "So to hold would . . . in effect substitute the District Court for the Board as the tribunal to hear and determine what Congress declared the Board exclusively should hear and determine in the first instance." *Id*. at 50. The Court similarly rejected the employer's argument that "the mere holding of the prescribed administrative hearing would result in irreparable damage." *Id* at 51. "Lawsuits also often prove to have been groundless," Justice Brandeis commiserated with the employer, "but no way has been discovered of relieving a defendant from the necessity of a trial to establish the fact." *Id*. at 51–52. The district court lacked jurisdiction, the Court reiterated, noting that not only had Congress vested jurisdiction in the federal courts of appeals, but had also instructed that "[t]his power shall be exclusive." *Id*. at 48 (quoting H.R. Rep. 1147, at 24).

"This provision of providing exclusive jurisdiction in the court of appeals over final orders from the Board," the Sixth Circuit observes, "has been characterized as an exhaustion rule based upon the well established axiom that parties must exhaust their administrative relief before procuring judicial review." *Detroit Newspaper Agency v. NLRB*, 286 F.3d 391, 397 (6th Cir. 2002) (citing *Shawnee Coal Co. v. Andrus*, 661 F.2d 1083, 1092 (6th Cir. 1981)).

"Of course," the Sixth Circuit cautions, "as with most procedural measures, the exhaustion doctrine as expressed in § 160(f) is not without exceptions." *Detroit Newspaper Agency*, 286 F.3d at 397. First, "in *Leedom v. Kyne*, 358 U.S. 184, 190 (1958), the Supreme Court found that a litigant may bypass available administrative procedures where there is a readily observable usurpation of power not granted to the agency by Congress." *Detroit Newspaper Agency*, 286 F.3d at 397. Significantly, however, "in *Board of Governors of the Federal Reserve System v. MCorp Financial, Inc.*, 502 U.S. 32, 43 (1991), the Supreme Court

revisited *Leedom* and rejected the proposition that *Leedom* authorizes judicial review of any agency action that is alleged to have exceeded the agency's statutory authority." *Detroit Newspaper Agency*, 286 F.3d at 397.

In *Leedom*, the Board decided to include professional and nonprofessional employees in a collective bargaining unit, but refused "to take a vote among the professional employees to determine whether a majority of them would vote for inclusion in such unit." 358 U.S. at 185 (internal quotation marks omitted). The union brought suit in district court, relying on § 9 of the Act, which provided that "in determining the unit appropriate for collective bargaining purposes, 'the Board shall not . . . decide that any unit is appropriate for such purposes if such unit includes both professional employees and employees who are not professional employees unless a majority of such professional employees vote for inclusion in such unit.' " 358 U.S. at 185 (quoting § 159(b)(1)). Noting that judicial review was otherwise unavailable for the professional employees, the Court continued: "[The] absence of jurisdiction of the federal courts would mean a sacrifice or obliteration of a right which Congress has given professional employees, for there is no other means, within their control to protect and enforce that right." *Id*. at 190 (internal quotation marks and citation omitted) (quoting *Switchmen's Union of N. Am. v. Nat. Mediation Board*, 320 U.S. 297, 300 (1943). Concluding the district court had jurisdiction over the union's suit, the Court wrote:

> Section 9(b)(1) is clear and mandatory. . . . Yet the Board included in the unit employees whom it found were not professional employees, after refusing to determine whether a majority of the professional employees would "vote for inclusion in such unit." Plainly, this was an attempted exercise of power that had been specifically withheld. It deprived the professional employees of a "right" assured to them by Congress. Surely, in these circumstances, a Federal District Court has jurisdiction of an original suit to prevent deprivation of a right so given.

*Id*. at 188–89 (quoting § 159(b)(1)).

In *MCorp*, in contrast, the Court concluded that the district court lacked jurisdiction to hear a challenge to an agency's action because the corporation "w[ould] have, in the Court of Appeals, an unquestioned right to review of both the regulation and its application." 502 U.S. at 44. Distinguishing *Leedom*, the Court wrote that *Leedom* "differs from this litigation in two critical ways. First, central to our decision in [*Leedom*] was the fact that the Board's interpretation of the Act would wholly deprive the union of a meaningful and adequate means of vindicating its statutory rights." *Id*. at 43. The Court elaborated:

> The cases before us today are entirely different from [*Leedom*] because [the statute] expressly provides MCorp with a meaningful and adequate opportunity for judicial review of the validity of the . . . regulation. If and when the Board finds that MCorp has violated that regulation, MCorp will have, in the Court of Appeals, an unquestioned right to review of both the regulation and its application.

*Id*. at 43–44. "The second, and related, factor distinguishing this litigation from [*Leedom*]," the Court continued, "is the clarity of the congressional preclusion of review." *Id*. at 44. In pertinent part, the statute provided that "no court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any [Board] notice or order under this section." 12 U.S.C. § 1818(i)(1), quoted in *MCorp*, 502 U.S. at 44. Thus, the Court concluded, "in this case the statute provides us with clear and convincing evidence that Congress intended to deny the District Court jurisdiction to review and enjoin the Board's ongoing administrative proceedings." 502 U.S. at 44.

In this case, as in *MCorp*, the statutory framework provides "a meaningful and adequate opportunity for judicial review." If the Tribe disagrees with the Board's final order, the Tribe may seek judicial review of the decision in the court of appeals. Moreover, the legal question the Tribe raises is subject to de novo review. *See San Manuel Indian Bingo & Casino v. NLRB*,

475 F.3d 1306, 1312 (D.C. Cir. 2007) ("Because the Board's expertise and delegated authority does not relate to federal Indian law, we need not defer to the Board's conclusion. Therefore, we decide de novo the implications of tribal sovereignty on the statutory construction question before us." (internal citations omitted)). Thus, not only will the Tribe have a meaningful opportunity for judicial review, the legal question the Tribe presents will be subject to the same standard of review that the Tribe would receive in this Court, had jurisdiction not been withheld by Congress. But Congress, of course, has expressly designated that review of the Board's decision shall be made by the court of appeals. 29 U.S.C. § 160. "Upon the filing of the record with it," the Act provides in pertinent part, "the jurisdiction of the court shall be exclusive." *Id*. Thus, as a district court in this circuit observed:

> To the extent plaintiff's right to relief depends on resolution of a substantial question of federal law, namely, the [Board's] exercise of jurisdiction over it, that question is properly decided by the [Act] in the first instance, then the court of appeals. This Court lacks jurisdiction to prevent the NLRB from proceeding on the charge that plaintiff is engaged in an unfair labor practice.

*Little River Band of Ottawa Indians v. NLRB*, 747 F. Supp. 2d 872, 890 (W.D. Mich. 2010). In sum, this Court lacks jurisdiction over the Tribe's complaint.

Seeking to avoid this conclusion, the Tribe makes several arguments. None, however, avoid this conclusion. First, the Tribe argues, the Act's "exhaustion [requirement] does not apply because the [Act] does not apply to the Tribe." Pl.'s Resp. 9. As discussed above, however, Congress has chosen to vest jurisdiction over this issue not in the district courts, but in the courts of appeals. *See generally* U.S. Const. art. III, § 1 ("The judicial power of the United States, shall be vested in one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish."). To establish that exhaustion requirement does not apply, the Tribe must demonstrate that it has no "meaningful and adequate opportunity for

-11-

judicial review." *MCorp*, 502 U.S. at 43.  The Tribe does not make this demonstration; indeed, the Tribe does not make this argument.  Rather, it argues that this Court should not require exhaustion because "[t]he very act of applying the [Act] in the first place" injures the Tribe's sovereignty.  *Myers*, however, precludes the Court from accepting this argument.  There, the Justice Brandeis wrote: "Obviously, the rules requiring exhaustion of the administrative remedy cannot be circumvented by asserting that . . . the mere holding of the prescribed administrative hearing would result in irreparable damage."  303 U.S. at 51.  Bound by this precedent, the Tribe's argument is precluded.

Seeking to avoid this conclusion, the Tribe contends that *Myers* does not apply as "*Myers* is only applicable if an Indian tribe's governmental rights have the same force and effect as a private litigant's commercial rights."  The Tribe elaborates that it is not a "private litigant," but rather a "domestic-dependent nation."  Thus, the Tribe concludes, this case is governed by the Supreme Court's holding in *McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10 (1963).  "The parallels between this case and *McColloch* are striking," the Tribe writes, elaborates: "Though the Tribe is not a foreign nation, as a domestic-dependent nation, it retains sovereign attributes analogous to those possessed by foreign governments."

Notwithstanding the Tribe's assertions, *McCulloch* is inapposite.  In that case, the Court was presented with "whether the Act as written was intended to have any application to foreign registered vessels employing alien seamen."  372 U.S. at 676. Answering in the negative, the Court concluded that the Act did not apply to the maritime operations of a foreign flagged vessel with a crew of foreign sailors in American waters.  *Id*. at 678.  The Court noted that a contrary holding would risk "international discord," explaining that "questions of such international import would remain as to invite retaliatory action from other nations."  *Id*. at 677.

Here, in contrast, although the Tribe is correct that it retains sovereign attributes, the extent of its sovereignty is not "analogous" to that of a foreign government. Discussing Indian tribes' unique status in American law, the Supreme Court explains: "Although no longer possessed of the full attributes of sovereignty, they remain a separate people, with the power of regulating their internal and social relations. . . . [H]owever, Congress has plenary authority to limit, modify or eliminate the powers of local self-government which the tribes otherwise possess." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56–57 (citing *Talton v. Mayes*, 163 U.S. 376, 384 (1896); *United States v. Kagama*, 118 U.S. 375, 381-82(1886)). Congress, of course, does not retain an analogous plenary authority to modify or eliminate a foreign government's powers of self-governance. And while international relations must account for the risk of "retaliatory action," economic and otherwise, similar considerations no longer animate the relations between the federal government and the tribes. As tribes are not "analogous to" as foreign sovereigns, *McCulloch* is inapposite.

Finally, the Tribe argues, "because controlling canons of Indian-law mandate the conclusion that the silent statute does not apply to tribes, the Board's attempt to apply the Act to the Tribe is not a case of requiring an administrative hearing." The issue before the Court, however, is not whether the canons require one result or another,[1] but rather whether Congress has vested jurisdiction in this Court to decide that issue. As detailed above, Congress has not done so. Rather, "the power to prevent any person from engaging in any unfair practice affecting commerce has been vested by Congress in the Board and the Circuit Court of Appeals." *Myers*,

---

[1] As an aside, the Court notes that it is not obvious that the canons do in fact mandate a particular conclusion in in this case. *See generally* Bryan H. Wildenthal, *How the Ninth Circuit Overruled a Century of Indian Jurisprudence — And Has So Far Gotten Away with It*, 2008 Mich. St. L. Rev. 547, 550 (2008) (noting "six of the seven federal circuits to address the issue — the Second, Seventh, Eighth, Ninth, Eleventh, and D.C. Circuits — have generally embraced the *Tuscarora-Coeur d'Alene* doctrine").

303 U.S. at 48. This is not to suggest that the Tribe may not in fact be correct that it is not subject to the Act. Rather, the Tribe cannot seek such a declaration in this Court, as Congress has not authorized this Court to grant the relief the Tribe seeks.

### IV.

Accordingly, it is **ORDERED** that the Board's motion to dismiss (ECF No. 10) is **GRANTED**.

It is further **ORDERED** that the Tribe's motion for a temporary restraining order and preliminary injunction (ECF No. 5) is **DENIED**.

It is further **ORDERED** that the Tribe's emergency motion for a temporary restraining order (ECF No. 27) is **DENIED AS MOOT**.

It is further **ORDERED** that the Tribe's complaint is **DISMISSED WITH PREJUDICE**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: December 23, 2011

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on December 23, 2011.

s/Tracy A. Jacobs
TRACY A. JACOBS